THE O'MARA LAW FIRM, P.C.
DAVID C. O'MARA, ESQ. (NEVADA BAR NO. 8599)
311 East Liberty St.
Reno, Nevada 89501
775-323-1321
775-323-4082 (fax)
david@omaralaw.net

*Attorney for Plaintiffs*

*(Additional counsel on signature page)*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| CHARLOTTE BOWNES; JOSEPH LAGRECA; JESSICA NAUMANN; and CHRISTOPHER GOODIN, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> INTERNATIONAL GAME TECHNOLOGY PLC; MGM RESORTS INTERNATIONAL; BALLY'S CORPORATION; PENN ENTERTAINMENT, INC.; STATION CASINOS, LLC, <br><br> Defendants | Case No. <br><br><br> **CLASS ACTION COMPLAINT** <br><br> (Jury Trial Demanded) |

Plaintiffs Charlotte Bownes, Joseph Lagreca, Jessica Naumann, and Christopher Goodin, on behalf of themselves and all others similarly situated, complain and allege as follows based on personal knowledge as to themselves, the investigation of their counsel, and information and belief as to all other matters, and demand trial by jury.  Plaintiffs believe that substantial evidentiary support will exist for the allegations in this complaint, after a reasonable opportunity for discovery.

## NATURE OF THE CASE

1.      This case concerns a scheme to defraud consumers perpetrated by Defendants MGM Resorts International ("Defendant MGM"), Bally's Corporation ("Defendant Bally's"), PENN Entertainment, Inc. ("Defendant PENN"), Station Casinos, LLC ("Defendant Station"), and Boyd Gaming Corporation ("Defendant Boyd") (collectively, the "Casino Defendants") through their deceptive and misleading promotion and operation of "Wheel of Fortune"-themed electronic gaming devices, manufactured and sold to them by Defendant International Game Technology PLC ("Defendant IGT"), on their casino floors nationwide.

2.      As explained in detail below, the "Wheel of Fortune" electronic gaming devices were designed and manufactured by Defendant IGT, and have been and continue to be operated by the Casino Defendants at their casinos nationwide, to systematically defraud casino patrons out of their hard-earned money.

3.      All of the "Wheel of Fortune"-themed electronic gaming devices at issue in this case contain, as a signature feature, an attached spinning "bonus wheel" that creates a "game-within-a-game."  It works like this: when a designated symbol appears on the primary component of the electronic gaming device, the player gets to spin an attached wheel that contains several equal-sized, pie-shaped segments, each of which is designated a specific monetary amount, and an indicator affixed atop the wheel that points downwards at the segments of the wheel (the "Bonus Wheel Feature").  When the spinning wheel stops, the wheel's indicator points to a particular segment of the wheel, which in turn indicates the monetary amount won by the player.

4.      Defendants' design, presentation, and promotion of the Bonus Wheel Feature depicts a truly mechanical spinning wheel, such as a roulette wheel – one that operates pursuant to the laws of physics.  Accordingly, casino players reasonably believe that when they play the game

and are able to spin the wheel, the indicator atop the wheel will point to one of the wheel's equal-sized segments at random when the wheel stops spinning, giving the player just as good of a chance of landing on the highest-value segment as the player has of landing on the lowest-value segment.

5.    However, Defendants fail to disclose that the outcome of a player's spin of the wheel is not random at all, but rather is predetermined by an internal computer that Defendants have programmed to ensure the wheel stops much more frequently with the indicator pointing at one of the segments with a lower monetary amount than with the indicator pointing at one of the segments with a higher monetary amount.  Defendants' intentional failure to disclose this critical fact fraudulently deprives players of increased winnings, and fraudulently induces players to play or to continue to play the subject devices, thus unjustly increasing Defendants' profits associated with such devices.  By way of analogy, the "Wheel of Fortune" game at issue in this case is the modern-day equivalent of a roulette wheel with a magnet surreptitiously affixed beneath the green zero and double-zero segments.

6.    The Casino Defendants have used and continue to use these enormously popular – and, from their perspective, profitable – electronic gaming devices to illegally siphon billions of dollars from consumers' pockets into their own coffers.

7.    Plaintiffs seek compensatory damages for themselves and a putative class comprised of all persons who played any of the "Wheel of Fortune" electronic gaming devices at any of the Casino Defendants' gaming establishments.  Plaintiffs also seek an injunction restraining and enjoining Defendants from promoting and operating "Wheel of Fortune"-themed electronic gaming devices without clearly and conspicuously disclosing the true odds and probabilities associated with the Bonus Wheel Feature of the games.

**PARTIES**

8.    Defendant International Game Technology PLC is incorporated in England and Wales.    IGT maintains offices in Las Vegas, Nevada, including its "Global Gaming Headquarters,"[1] and in Reno, Nevada, its "principal location of manufacturing, logistics, and supply chain leadership."[2]    IGT designs, manufactures, markets, and distributes computerized casino gaming products and systems across international markets, including in the state of Nevada and throughout the United States, has sold and continues to sell electronic gaming devices (including the "Wheel of Fortune"-themed devices) to the Casino Defendants, and has shipped and continues to ship such devices to the Casino Defendants' gaming establishments in Las Vegas, Nevada and throughout the United States.

9.    Defendant MGM Resorts International is a Delaware corporation with a principal place of business in Las Vegas, Nevada.    Defendant MGM operates resorts and casinos domestically and internationally, including the MGM Grand Detroit (in Detroit, Michigan) and the MGM Springfield (in Springfield, Massachusetts).

10.    Defendant Bally's Corporation is a Delaware corporation with a principal place of business in Providence, Rhode Island.    Defendant Bally's operates resorts and casinos domestically, including the Tropicana Las Vegas Casino and Resort (in Las Vegas, Nevada), Bally's Twin River Lincoln Casino Resort (in Lincoln, Rhode Island), and Bally's Vicksburg Casino and Hotel (in Vicksburg, Mississippi).

11.    Defendant PENN Entertainment, Inc. is a Pennsylvania corporation with a principal place of business in Wyomissing, Pennsylvania.    Defendant PENN operates resorts and casinos domestically, including Ameristar Casino Vicksburg (in Vicksburg, Mississippi) and Cactus Petes Resort Casino and Horshu Hotel (both in Jackpot, Nevada) and M Resort (in Henderson, Nevada).

---

[1] International Game Technology PLC, Form 20-F "Annual Report," March 12, 2024, available at https://d18rn0p25nwr6d.cloudfront.net/CIK-0001619762/a5c8b83f-2e49-4c6a-a3e1-ec481903c19e.pdf, at 24.

[2] *Id.*

12.    Defendant Station Casinos, LLC is a Nevada limited liability company with a principal place of business in Las Vegas, Nevada.  Defendant Station owns and operates resorts and casinos domestically, including the Palace Station (in Las Vegas, Nevada).

13.    Defendant Boyd Gaming Corporation is a Nevada corporation with a principal place of business in Las Vegas, Nevada.  Defendant Boyd owns and operates resorts and casinos domestically, including The Orleans (in Las Vegas, Nevada).

14.    Plaintiff Charlotte Bownes is a natural person and is, and at all times relevant hereto was, a resident of Detroit, Michigan.

15.    Plaintiff Joseph Lagreca is a natural person and is, and at all times relevant hereto was, a resident of East Providence, Rhode Island.

16.    Plaintiff Jessica Naumann is a natural person and is, and at all times relevant hereto was, a resident of Las Vegas, Nevada.

17.    Plaintiff Christopher Goodin is a natural person and is, and at all times relevant hereto was, a resident of Louisville, Mississippi.

## JURISDICTION AND VENUE

18.    This action presents claims arising from a scheme to defraud the gaming public.  It is brought pursuant to the Racketeer Influences and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 – 1968, and principles of state common law.  Therefore, this Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1367 (supplemental jurisdiction).

19.    This Court also has jurisdiction over the state-law causes of action pursuant to 28 U.S.C. § 1332 because (i) at least one member of each of the putative classes is a citizen of a state different from the Defendants, (ii) the amount in controversy exceeds $5,000,000 with respect to each of the putative classes, exclusive of interest and costs, and (iii) there are at least 100 members of each of the putative classes.

20.    Personal jurisdiction and venue are proper because each of the Defendants either resides in or has substantial personal contacts with Nevada, and because the claims alleged in this

action arose in substantial part from events and omissions by Defendants in Nevada, including at their corporate headquarters and/or gaming establishments in Nevada.

**FACTUAL BACKGROUND**

21.   An "electronic gaming device" is an electromechanical device, or electrical device or machine which, upon payment of consideration, is available to play or operate as a gambling game.

22.   Slot machines are the most common type of electronic gaming device.   Such devices typically have three or more spinning reels containing a variety of symbols.   Players place bets by inserting money into the machine and pressing a button or pulling an arm to commence the spinning of the reels.   When the reels stop spinning, if a designated array of symbols appears on the payline, the player is awarded the amount of money associated with that designated array. In modern slot machines, the outcomes of the spinning reels are pre-determined by a computer chip containing a random number generator.

23.   Before the advent of electronic gaming devices, casinos offered mechanical spinning wheel games of chance to their patrons.   Roulette is a classic example of such a game.   A commonly understood trait of these spinning wheel games is that the wheel has an equal chance of stopping on each space.   That is because spinning wheels are naturally subject to the laws of physics and because the area of the wheel attributable to each number is the same, meaning the wheel has an equal chance of landing on "5" as it does on "0."   If a casino manipulated the wheel so that it stopped on "0" more frequently than it stopped on "5", such a wheel would properly be characterized as "rigged."

24.   More recently, certain electronic gaming devices have begun to incorporate, as a signature feature designed to induce patrons to play the device, an attached spinning 'bonus' wheel that creates a "game-within-a-game" (i.e., the "Bonus Wheel Feature").   When a designated symbol appears on the primary component of the electronic gaming device, the player "wins" a spin of an attached wheel that contains equally-spaced segments representing different monetary amount ranging from, comparatively speaking, very small to very large.   When the spinning wheel

stops, an indicator affixed atop the wheel points to a particular segment of the wheel, which in turn designates the monetary amount won by the player.

25.     The Bonus Wheel Feature is designed to increase player engagement and raise expectations that the player may win additional money beyond that the player is eligible to win through the primary component of the device alone.  In this way, the Bonus Wheel Feature induces casino patrons to play or continue to play the associated electronic gaming device, spending more money and increasing revenues to the operator of the device.

26.     The Bonus Wheel Feature was patented by Anchor Gaming, Inc. on October 20, 1998.  The patent recognizes the draw that the Bonus Wheel Feature would have for casino patrons, stating that the Bonus Wheel Feature is "designed to provide added excitement to a gaming device to increase the enjoyment to players and to serve as an added attraction to potential players."[3]

27.     In 1997, after licensing the patent from Anchor Gaming, Inc., Defendant IGT designed, manufactured, marketed, and distributed the first electronic gaming device incorporating the Bonus Wheel Feature, called "Wheel of Fortune."  Since that time, Defendant IGT has designed, manufactured, marketed, and distributed many variations of the "Wheel of Fortune" gaming device, all of which feature the signature Bonus Wheel Feature, which operates in materially the same way on all such devices.

28.     In 2001, Defendant IGT acquired Anchor Gaming, Inc. in a stock-for-stock transaction valued at $1.37 billion.

29.     "Wheel of Fortune"-themed games are the most popular electronic gaming devices containing the Bonus Wheel Feature.  The classic version of the machine has a 3-reel format and associated pay tables in the primary game component.  The third reel contains a "SPIN" symbol that gives the player a bonus payout when the "SPIN" symbol lands on the payline.  The amount of the bonus is determined by a "wheel of fortune" mounted at the top of the machine.  The wheel starts spinning when the player presses a button to activate it.

---

[3] U.S. Patent No. 5,823,874 (issued October 20, 1998).

30.     Wheel of Fortune devices are designed in their appearance to replicate the movement of a normal mechanical wheel, e.g., a wheel which has an equal chance of landing on each of its segments.  Indeed, the wheel on the Wheel of Fortune devices contains equal-sized segments, each bearing a different number, and each representing different levels of a bonus payout.  When the wheel stops, the player is awarded the bonus identified by the segment on which the wheel indicator has landed.  Players are led to believe that, based upon this design, they have an equal chance of winning each of the payout amounts designated on each of the various equal-sized segments of the wheel when it is spun.

31.     In some versions of the Wheel of Fortune slot machine, the traditional spinning reels in the primary game are replaced by a digital display which hosts the primary game.  The digital display either emulates the appearance of spinning reels or depicts an alternative primary game model.  However, in all Wheel of Fortune devices subject to this action, the secondary game feature remains the same: an attached bonus wheel with equally-sized segments which spins and indicates the award that the player receives as the result of the secondary game.

32.     Defendant IGT further encourages consumers' perception that the Bonus Wheel Feature conveys an equal chance of landing on any of its segments through the brand name of these devices—the "Wheel of Fortune."  The use of the word "wheel" in this name is specifically intended to conjure the impression of a freely rotating mechanical wheel that spins and stops naturally pursuant to the laws of physics, such as the one in the famous television game show of the same name.

33.     The patent held by Defendant IGT for the design of the Bonus Wheel Feature recognizes the power of this false allusion of a freely rotating wheel on the Wheel of Fortune television show.  It states:

> Those familiar with games involving winning payouts, such as the popular television game show entitled 'WHEEL OF FORTUNE' will realize that as players and observers watch a large wheel spin and gradually come to rest, the players experience a heightened feeling of anticipation and excitement as the wheel is slowing down to indicate a possible prize.[4]

---

[4] *Id.*

34.    After acquiring the rights to use Anchor Gaming, Inc.'s patent, Defendant IGT licensed the Wheel of Fortune brand from Sony Pictures Television, Inc. ("Sony"), the producer of the Wheel of Fortune television game show. Defendant IGT did so for the purpose of driving home the false association between the game of chance depicted on Sony's television program and the Bonus Wheel Feature on its own electronic gaming devices.

35.    In 2023, the licensing agreement between Sony and Defendant IGT was renewed for another ten years. In announcing the deal, Suzanne Prete, Sony Pictures Television's Executive Vice President of Game Shows, stated:

> This landmark agreement guarantees that casino and lottery players around the world can enjoy world-class Wheel of Fortune-themed games for years to come. Sony Pictures Television and IGT share the same commitment to applying the Wheel of Fortune brand in ingenious ways, creating growth opportunities and ensuring that Wheel of Fortune remains synonymous with winning and fun.[5]

36.    This licensing agreement permits Defendant IGT to use the trademarked name "Wheel of Fortune." It also provides Defendant IGT the right to use the sound effects, tones, and melodies of the popular television show on its electronic gaming devices. According to Boris Hallerbach, IGT's director of product management for premium products, "You can't walk across a casino floor without hearing [the licensed sounds]."[6] He continued:

> We used that wheel from Anchor in the process and created the game that combined the Wheel of Fortune brand with strong IGT base games . . . It was the first brand in slots, and people with their familiarity with the show on television every night I think had an instant affinity to the Wheel of Fortune slot game.[7]

37.    Defendant IGT also licenses the voices of the Wheel of Fortune television game show co-hosts Vanna White and Pat Sajak and announcer Jim Thornton for use in its Wheel of Fortune electronic gaming devices. These voices, along with the sounds from the television game

---

[5] Press Release, IGT, "IGT Secures Exclusive Wheel of Fortune Licensing Rights for Gaming, Lottery, iGaming and iLottery via 10-Year Agreement" (June 5, 2023), available at https://ir.igt.com/news/news-details/2023/IGT-Secures-Exclusive-Wheel-of-Fortune-Licensing-Rights-for-Gaming-Lottery-iGaming-and-iLottery-via-10-Year-Agreement/default.aspx.

[6] Richard N. Velotta, *Las Vegas Review-Journal*, "Iconic Wheel of Fortune still top slot 25 years later" (Aug. 5, 2021), available at https://www.reviewjournal.com/business/casinos-gaming/iconic-wheel-of-fortune-still-top-slot-25-years-later-2414176/.

[7] *Id.*

show, are intended to further consumers' false association between the spinning wheel on the television program, which is subject to random chance probabilities of landing on any given segment, and the rigged wheel on the electronic gaming devices at issue in this case.

38.    Defendant IGT has also enlisted the famous co-host of the Wheel of Fortune television program, Vanna White, to promote its electronic gaming devices in live appearances. These appearances further promote a false association between the game of chance depicted on the game show and the rigged wheel on the gaming devices.  For example, Ms. White appeared at Defendant IGT's booth at the 2016 Global Gaming Expo trade show, as depicted below:[8]



Wheel of Fortune co-host and letter-turner Vanna White plays a Wheel of Fortune slot machine at the 2016 Global Gaming Expo trade show. (Courtesy of IGT)

---

[8] *Id.*; *see also* C. Moon Reed, *Las Vegas Weekly*, "Chatting with Vanna White About 25 Years of 'Wheel    of    Fortune'    Slots"    (October    14,    2021),    available    at https://lasvegasweekly.com/news/2021/oct/14/chatting-with-vanna-white-wheel-of-fortune-slots/ (noting that "White was in town recently to celebrate the 25th anniversary of IGT's *Wheel of Fortune* slot franchise at this year's Global Gaming Expo (G2E)").

39.     Defendant MGM is a regular sponsor of Sony's television program Wheel of Fortune.  For example, Defendant MGM recently sponsored Wheel of Fortune's 8,000th episode during the game show's "Big Money Week" which aired from May 20, 2024 through May 24, 2024.[9]  As part of the sponsorship, Defendant MGM placed logos on the set and graphics of the Wheel of Fortune television program during its "Big Money Week."

40.     Defendant IGT's Wheel of Fortune gaming devices with the Bonus Wheel Feature have become enormously popular.  IGT recently stated that "Wheel of Fortune Slots is hailed as one of the most successful slot themes of all time."[10]

41.     The Casino Defendants have collectively deployed hundreds of Wheel of Fortune machines containing the Bonus Wheel Feature on their gaming floors.  The Casino Defendants collectively generate at least hundreds of millions of dollars of revenue annually from the operation of these machines.

42.     However, the Bonus Wheel Feature is not what it seems.  The electromechanically operated Bonus Wheel Feature is linked to an internal computer that determines the segment of the wheel on which the wheel's indicator actually stops.  The wheel also contains a drive mechanism which gradually reduces the rate of spin of a mechanical wheel, which is designed to merely simulate the movement of a mechanical wheel.  Unlike a mechanical wheel, however, which is truly random and has an equal chance of stopping at each segment on the wheel, the Bonus Wheel Feature is rigged and manipulated by the internal computer to stop far more frequently with the indicator pointing at segments with lower monetary amounts than at segments with higher monetary amounts.

---

[9] Press Release, BetMGM, "BetMGM Sponsors Progressive Jackpot During Wheel of Fortune's "Big Money Week" (May 17, 2024), available at https://www.prnewswire.com/news-releases/betmgm-sponsors-progressive-jackpot-during-wheel-of-fortunes-big-money-week-302148486.html.

[10] Press Release, IGT, "IGT Extends Success of Wheel of Fortune Brand to New Product Categories at Global Gaming Expo 2024," available at https://www.igt.com/Explore%20IGT/News/News%20Room%20Details?Index=20240924d0c1.

43.    IGT devised the bonus wheel feature with the intent to deceive players into believing that the Bonus Wheel Feature operates in the same manner as a mechanical wheel—e.g., that once spun, the wheel operates pursuant to the laws of physics and will rotate with a constant rate of change of its angular velocity, and thus has an equal chance of landing on each of the segments.  Indeed, the patent relating to the Bonus Wheel Feature expressly acknowledges that the intent of the device is to give the false appearance of a naturally rotating wheel, while permitting the device's operator to select a "predetermined frequency" of occurrence for the wheel's indicator to land on "each individual bonus payout":

> According to another preferred embodiment of the present invention, a bonus indicator is connected to a [*sic*] electromechanical control unit, for example a motor, which gradually decreases the rate of movement of the bonus indicator before the bonus indicator stops.  **According to this embodiment of the present invention, players can be provided with a realistic sense of a totally mechanical indicator.**  Those skilled in the art will appreciate that such a control unit can also readily be connected to a random generator which will randomly select the winning payout according to a **predetermined frequency of occurrence for each individual bonus payout**, and then cause the bonus indicator to stop at the desired area.[11]

44.    Based upon Defendants' design and presentation of the Bonus Wheel Feature, which simulates a truly naturally spinning wheel that will rotate and come to a stop in accordance with the laws of physics, such as a roulette wheel, casino players reasonably believe that wheel on the "Wheel of Fortune"-themed gaming devices likewise has an equal chance of stopping at each segment on the wheel—and that they therefore have as much of a change of winning the highest-value prize on the wheel as the do the lowest-value prize on the wheel.  Defendants fail to disclose, however, that the wheel is controlled by an internal computer that selects the segments of the wheel that the indicator will land on (and thus the dollar amounts of the payouts to the players) according to a predetermined frequency of occurrence for each individual bonus payout set by the device's operator.  Stated simply, the wheel device is rigged by an internal computer to stop much more frequently on the segments with lower monetary amounts than the segments with higher monetary amounts.

---

[11] U.S. Patent No. 5,823,874 (issued October 20, 1998).

45.     Each of the Casino Defendants programmed the internal computers of each of the "Wheel of Fortune"-themed electronic gaming devices accessible to patrons at each of their gaming establishments nationwide, for the entire duration of the applicable limitation periods, to stop much more frequently on the segments of the wheel with lower monetary amounts than the segments of the wheel with higher monetary amounts.

46.     The Casino Defendants know, and knew at all times relevant hereto, that the Bonus Wheel Feature is misleading and deceptive to consumers who frequented their gaming establishments because they have access to proprietary sales materials and instruction manuals from Defendant IGT describing the ability to program the wheel to land on spaces with lower monetary amounts more frequently than spaces with higher monetary amounts, and because (as alleged above) they have, in fact, configured the "Wheel of Fortune" gaming devices at their gaming establishments to operate in this manner, deployed those machines on their gaming floors, and reaped enormous revenue from consumers' spending on the rigged machines.  Nonetheless, the Casino Defendants fail to disclose any of this to their customers.

47.     As a direct and proximate result of Defendants' practice described above, customers are deceived and misled into believing that, when they spin the wheel while playing any of the Defendant IGT-manufactured "Wheel of Fortune"-themed gaming devices available at any of the Casino Defendants' gaming establishments, they have an equal chance of receiving each of the monetary amounts set forth on each of the segments of the wheel.

48.     Customers of the Defendant Casinos have been and continue to be damaged by Defendants' fraudulent practices alleged herein, because customers reasonably expect, due to Defendants' representations and omissions, that if they spin the wheel while playing any of the "Wheel of Fortune"-themed gaming devices, they have an equal chance of receiving each of the monetary amounts set forth on each of the segments of wheel.  In fact, however, the wheel on each such device is, and at all times relevant hereto was, programmed to stop much more frequently on segments that pay the smaller monetary amounts to the customer than the segments that pay the larger monetary amounts to the customer.  Defendants' conduct not only deprives players of the monies they would have won if the Bonus Wheel Feature had been as represented, but also induces

1  players to begin to play and then to continue to play the devices, in all cases unjustly increasing
2  the Defendants' revenues and profits.

3      49.    Accordingly, Defendants have defrauded Plaintiffs and the putative class members
4  into spending money to play the Wheel of Fortune-themed gaming devices under the false pretense
5  that the Bonus Wheel Feature conveys an opportunity for the player to spin the wheel with an
6  equal chance of the wheel's indicator landing on each of its segments, and that the player thus has
7  an equal chance of receiving each of the monetary payout amounts designated on each of the
8  wheel's segments as the result of each spin.

9      50.    Defendants have promoted the Wheel of Fortune-themed devices with the Bonus
10 Wheel Feature in interstate wires and through the mail, including in promotions which include
11 visual representations of the machine and utilize the brand name "Wheel of Fortune" on their
12 websites, social media accounts, and in various advertising mediums which travel by mail
13 including direct mail solicitations, print advertisements, and magazine publications.

14     51.    Defendant IGT regularly publishes and transmits press releases, promotional
15 materials, and advertisements over interstate wires which mislead the gaming public into believing
16 that the Bonus Wheel Feature operates as a random game of chance.

17     52.    For example, Defendant IGT publishes promotional videos on the internet which
18 feature individuals spinning a normal mechanical wheel to promote its Wheel of Fortune brand, as
19 shown in the following screenshot:[12]

20
21
22

23
24
25
26
27

28 [12] IGT, "Wheel of Fortune – Hawaiian Getaway by IGT – Game Launch 2018" (October 30, 2018),
available at https://www.youtube.com/watch?v=DpKLY59Wzto.

53.    Defendant IGT also regularly publishes and disseminates over interstate wires "Product Demos" depicting the Bonus Wheel Feature to promote Wheel of Fortune gaming devices to casinos and casino patrons alike.  An example is pictured in the screenshot below[13]:



**Wheel of Fortune Diamond Spins Pink Diamond by IGT - Product Demo**

IGT
9.34K subscribers          Subscribe                                    👍 4    👎      ↗ Share    ⬇ Save    ⋯

408 views  Feb 15, 2024
The newest addition to the Diamond Spins family of games features wilds in the base game and up to three wheel pointers that can lead to massive wins.

---

[13] IGT, "Wheel of Fortune Diamond Spins Pink Diamond by IGT – Product Demo" (February 15, 2024), available at https://www.youtube.com/watch?v=KoWVu8cCtE4.

54.     Defendant IGT regularly publishes and disseminates over interstate wires photographs and press releases promoting associations between the Wheel of Fortune television game show, with its naturally spinning wheel operating pursuant to the laws of physics, and the Wheel of Fortune-themed gaming devices, with their rigged Bonus Wheel Feature programmed to maximize Defendants' profits.[14]

55.     Each of the Casino Defendants promotes the availability of Wheel of Fortune-themed gaming devices with the Bonus Wheel Feature at their properties, including their properties in Nevada and elsewhere throughout the United States, to consumers over interstate wires.[15]

56.     The Casino Defendants have communicated with Defendant IGT over interstate wires and/or the mail to negotiate the purchase of Wheel of Fortune-themed gaming devices with the Bonus Wheel Feature.

57.     The Casino Defendants have communicated with Defendant IGT over interstate wires and/or the mail to coordinate the delivery of Wheel of Fortune-themed gaming devices with the Bonus Wheel Feature to their properties, including their properties in Nevada and elsewhere throughout the United States.

58.     The Casino Defendants have communicated with Defendant IGT over interstate wires and/or the mail to configure the Wheel of Fortune-themed gaming devices utilized at their properties (including their properties in Nevada and elsewhere throughout the United States).

---

[14] *See, e.g.*, Press Release, IGT, "Pat Sajak, Vanna White Will Help IGT Launch Newest Version of Wheel of Fortune® Slot Machine at Global Gaming Expo" (Sept. 10, 2015), available at https://www.igt.com/Explore-IGT/News/News-Room-Details?Index=201509171615.

[15] *See, e.g.*, Encore Boston Harbor, "Winner, Winner. A lucky guest won $40,000 playing Wheel of Fortune. Congratulations!" (June 6, 2022), available at https://www.facebook.com/photo.php?fbid=5253596724662907&id=608422419180384&set=a.722841301071828; MGM Grand Detroit, "Wheel of Fortune" (June 9, 2016), available at https://www.facebook.com/watch/?v=10157759468485206 (promoting a jackpot won on a Wheel of Fortune device at the MGM Grand Detroit on the casino's Facebook page); Bally's Lincoln, "Thousands of Slot Machines in RI," available at https://casinos.ballys.com/lincoln/slots.htm (promoting the availability of Wheel of Fortune machines at Bally's Twin River Lincoln Casino Resort in Lincoln, Rhode Island).

59.    The Casino Defendants have communicated with Defendant IGT over interstate wires and/or the mail to maintain and repair the Wheel of Fortune-themed gaming devices utilized at their properties.

60.    The Casino Defendants have communicated with Defendant IGT over interstate wires and/or the mail to discuss the design of Wheel of Fortune-themed gaming devices with the Bonus Wheel Feature.

61.    The Casino Defendants have sent funds to Defendant IGT over interstate wires and/or the mail to purchase Wheel of Fortune-themed gaming devices with the Bonus Wheel Feature.    Defendant IGT has accepted those funds in furtherance of the fraudulent scheme described herein.

## CLAIMS OF THE NAMED PLAINTIFFS

62.    Each of the Plaintiffs has played at least one Wheel of Fortune-themed gaming device with the Bonus Wheel Feature manufactured by Defendant IGT, at least one gaming establishment operated by at least one of the Casino Defendants.

### A.    Charlotte Bownes

63.    Plaintiff Bownes has played Wheel of Fortune-themed gaming devices with the Bonus Wheel Feature manufactured by Defendant IGT, and has spun the wheel in the Bonus Wheel Feature when she played the devices.

64.    Among other times, Plaintiff Bownes played Wheel of Fortune-themed gaming devices with the Bonus Wheel Feature, and spun the wheel in the device's Bonus Wheel Feature, at the MGM Grand Detroit on or about November 23, 2021 and November 24, 2021.  Plaintiff Bownes lost money playing the Wheel of Fortune-themed gaming devices, including on those dates.

65.    When Plaintiff Bownes played the Wheel of Fortune-themed gaming devices with the Bonus Wheel Feature, she believed, based upon Defendant IGT and Defendant MGM's actions and omissions, that if she obtained a bonus spin of the wheel, she had an equal chance of receiving each of the monetary amounts displayed on the wheel, including the highest monetary amounts displayed on the wheel.

66.     In reality, however, due to Defendant IGT and Defendant MGM's manipulation of the Wheel of Fortune-themed gaming devices with the Bonus Wheel Feature that Plaintiff Bownes played, Plaintiff Bownes was not afforded an equal chance to win each of the monetary amounts listed on the segments of the wheel when she spun the wheel.  This is because Defendant IGT and Defendant MGM had intentionally programmed the wheel to land on low-value segments with a significantly greater frequency than on high-value segments.

67.     Had Plaintiff Bownes known the truth about the way in which the Wheel of Fortune-themed gaming devices operate, she would not have risked money playing the devices.

**B.     Joseph Lagreca**

68.     Plaintiff Lagreca has played Wheel of Fortune-themed gaming devices with the Bonus Wheel Feature manufactured by Defendant IGT, and has spun the wheel in the Bonus Wheel Feature when he played the devices.

69.     Among other times, Plaintiff Lagreca played Wheel of Fortune-themed gaming devices with the Bonus Wheel Feature, and spun the wheel in the device's Bonus Wheel Feature, at the Bally's Twin River Lincoln Casino Resort (operated by Defendant Bally's) on August 13, 2022 and the MGM Springfield (operated by Defendant MGM) on October 2, 2022.  Plaintiff Lagreca lost money playing the Wheel of Fortune-themed gaming devices, including on those dates.

70.     When Plaintiff Lagreca played the Wheel of Fortune-themed gaming devices with the Bonus Wheel Feature, he believed, based upon Defendant IGT, Defendant Bally's, and Defendant MGM's actions and omissions, that if he obtained a bonus spin of the wheel, he had an equal chance of receiving each of the monetary amounts displayed on the wheel, including the highest monetary amounts displayed on the wheel.

71.     In reality, however, due to Defendant IGT, Defendant Bally's, and Defendant MGM's manipulation of the Wheel of Fortune-themed gaming devices with the Bonus Wheel Feature that Plaintiff Lagreca played, Plaintiff Lagreca was not afforded an equal chance to win each of the monetary amounts listed on the segments of the wheel when he spun the wheel.  This is because Defendant IGT, Defendant Bally's, and Defendant MGM had intentionally programmed

the wheel to land on low-value segments with a significantly greater frequency than on high-value segments.

72.    Had Plaintiff Lagreca known the truth about the way in which the Wheel of Fortune-themed gaming devices operate, he would not have risked money playing the devices.

**C.    Jessica Naumann**

73.    Plaintiff Naumann has played Wheel of Fortune-themed gaming devices with the Bonus Wheel Feature manufactured by Defendant IGT, and has spun the wheel in the Bonus Wheel Feature when she played the devices.

74.    Among other times, Plaintiff Naumann played Wheel of Fortune-themed gaming devices with the Bonus Wheel Feature, and spun the wheel in the device's Bonus Wheel Feature, at Palace Station (operated by Defendant Station) on January 18, 2021, and The Orleans (operated by Defendant Boyd) on January 18, 2021.  Plaintiff Naumann lost money playing the Wheel of Fortune-themed gaming devices, including on those dates.

75.    When Plaintiff Naumann played the Wheel of Fortune-themed gaming devices with the Bonus Wheel Feature, she believed, based upon Defendant IGT, Defendant Station, and Defendant Boyd's actions and omissions, that if she obtained a bonus spin of the wheel, she had an equal chance of receiving each of the monetary amounts displayed on the wheel, including the highest monetary amounts displayed on the wheel.

76.    In reality, however, due to Defendant IGT, Defendant Station, and Defendant Boyd's manipulation of the Wheel of Fortune-themed gaming devices with the Bonus Wheel Feature that Plaintiff Naumann played, Plaintiff Naumann was not afforded an equal chance to win each of the monetary amounts listed on the segments of the wheel when she spun the wheel. This is because Defendant IGT, Defendant Station, and Defendant Boyd's had intentionally programmed the wheel to land on low-value segments with a significantly greater frequency than on high-value segments.

77.    Had Plaintiff Naumann known the truth about the way in which the Wheel of Fortune-themed gaming devices operate, she would not have risked money playing the devices.

### D. Christopher Goodin

78.    Plaintiff Goodin has played Wheel of Fortune-themed gaming devices with the Bonus Wheel Feature manufactured by Defendant IGT, and has spun the wheel in the Bonus Wheel Feature when he played the devices.

79.    Among other times, Plaintiff Goodin played Wheel of Fortune-themed gaming devices with the Bonus Wheel Feature, and spun the wheel in the device's Bonus Wheel Feature, at the Ameristar Casino Vicksburg (operated by Defendant PENN) and Bally's Vicksburg Casino and Hotel (operated by Defendant Bally's) on the following dates: March 4, 2024 through March 7, 2024; March 24, 2024; April 20, 2024; May 14, 2024; and May 19, 2024.  Plaintiff Goodin lost money playing the Wheel of Fortune-themed gaming devices, including on those dates.

80.    When Plaintiff Goodin played the Wheel of Fortune-themed gaming devices with the Bonus Wheel Feature, he believed, based upon Defendant IGT, Defendant PENN, Defendant Bally's actions and omissions that if he obtained a bonus spin of the wheel, he had an equal chance of receiving each of the monetary amounts displayed on the wheel, including the highest monetary amounts displayed on the wheel.

81.    In reality, however, due to Defendant IGT, Defendant PENN, and Defendant Bally's manipulation of the Wheel of Fortune-themed gaming devices with the Bonus Wheel Feature that Plaintiff Goodin played, Plaintiff Goodin was not afforded an equal chance to win each of the monetary amounts listed on the segments of the wheel when he spun the wheel.  This is because Defendant IGT, Defendant PENN, and Defendant Bally's had intentionally programmed the wheel to land on low-value segments with a significantly greater frequency than on high-value segments.

82.    Had Plaintiff Goodin known the truth about the way in which the Wheel of Fortune-themed gaming devices operate, he would not have risked money playing the devices.

### CLASS ACTION ALLEGATIONS

83.    Pursuant to Federal Rule of Civil Procedure 23(b)(1), 23(b)(2), 23(b)(3), and where applicable, 23(c)(4), Plaintiffs bring this action, on behalf of themselves and all persons who spent

money to play any Wheel of Fortune-themed gaming device containing a Bonus Wheel Feature at any property in the United States owned or operated by any of the Casino Defendants.

84.    Excluded from the Classes are Defendants' officers, directors, and employees; any entity in which any Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendants.    Also excluded from the Classes are members of the judiciary to whom this case is assigned, their families, and members of their staff.

85.    Plaintiffs reserve the right to modify the definitions of the Class, including based on discovery and further investigation.

86.    The members of the Class are so numerous that their individual joinder herein is impracticable.    Plaintiffs are informed and believe, and thereupon allege, that the members the Class number in the millions.    The precise number of members of the Class and their identities are unknown to Plaintiffs at this time but will be readily determined in discovery, including by reference to records maintained by Defendants, including but not limited to players card records. Members of the Classes may be notified of the pendency of this action by mail and/or publication through the records of Defendants.

87.    Plaintiffs' claims are typical of the claims of the members of the Class they seek to represent in that Plaintiffs and all members of the Class were injured and sustained damages by Defendants' uniform wrongful conduct—namely, Defendants' practices of misrepresenting, by action and/or omission, the statistical probability of winning higher-value payouts in connection with the Bonus Wheel Feature of the Wheel of Fortune-themed gaming devices.

88.    Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual members.    Legal and factual questions common to the Classes include, but are not limited to:

        a.    Whether Defendants engaged in the alleged conduct;

        b.    Whether the Bonus Wheel Feature is programmed by Defendants so that the wheel does not rotate naturally pursuant to the laws of physics, such that the wheel has an equal chance of stopping on each segment, but rather rotates in manner that ensures

it will stop on lower-value segments at a significantly greater frequency than higher-value segments;

c. Whether Defendants have established a policy and practice of failing to disclose that the wheel is pre-programmed as alleged in this Complaint and that players who spin the wheel are far more likely to receive lower-value amounts than larger-value amounts as a result of their spins;

d. Whether Defendants used interstate wires or the mail to advance their fraudulent scheme;

e. Whether Plaintiffs and the members of the Class are entitled to damages and the method of calculating those damages; and

f. Whether the Plaintiffs and the members of the Class are entitled to injunctive relief and the extent of that injunctive relief.

89.    Plaintiffs are adequate representatives of the Class because none of the Plaintiffs' interests conflict with the interests of the other members of the Class they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of the members of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

90.    The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Class.  Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of such issues.

**FIRST CLAIM FOR RELIEF**
**RICO, 18 U.S.C. § 1962(a)**
**By Plaintiffs, Individually and On Behalf of Members of the Class**

91.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

92.    Each of the Defendants is a "person" as defined in 18 U.S.C. § 1961(3).

93.    Each of the Casino Defendants and Defendant IGT comprise an "association-in-fact" and an "enterprise" as defined in 18 U.S.C. § 1961(4).

94.    Each of the "associations-in-fact" and "enterprises" between Defendant IGT and the Casino Defendants engages in a conspiracy designed to conceal the true nature of the Wheel of Fortune-themed electronic gaming devices that have a Bonus Wheel Feature.

95.    All of the Defendants are associated-in-fact and their association-in-fact constitutes an enterprise under 18 U.S.C. § 1961(4).  That associations-in-fact and enterprise engages in a conspiracy designed to conceal the true nature of the Wheel of Fortune-themed electronic gaming devices that have a Bonus Wheel Feature.

96.    Each of the enterprises identified above are ongoing and each has an existence distinct from the pattern of racketeering activity alleged herein.  That distinct existence arises from activities of such enterprises related to legalized casino gambling, but which do not involve the manufacture, marketing, promotion, distribution, operation, or the collection or retention of revenues of the Wheel of Fortune-themed electronic gaming devices.

97.    Each of the enterprises identified above engage in, and their activities affect, interstate commerce.  Among other things, Defendants transport the Wheel of Fortune-themed electronic gaming devices and transact business through interstate travel, the mail, by interstate wires, and by telephone.  Defendants advertise the Wheel of Fortune-themed electronic gaming devises through various mediums, including their websites, social media accounts, and various print advertisements.

98.    Defendants have engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) involving multiple predicate acts of mail fraud (18 U.S.C. § 1341) and

wire fraud (18 U.S.C. § 1343), and aided and abetted the commission of those predicate acts in violation of 18 U.S.C. § 2.

99.     As more fully set forth above, Defendants have actively participated in a course of conduct, commencing with the introduction of the Wheel of Fortune-themed electronic gaming devices and continuing today, which has misled Plaintiffs and the Class.  Defendants have pursued such activities with the intention of creating the perception that the Bonus Wheel Feature of the Wheel of Fortune-themed electronic gaming devices operates as a true game of chance and is comparable to its traditional mechanical wheel counterparts that operate naturally pursuant to the laws of physics.

100.    Defendants' misconduct and the fraud at the heart of this action involves the labelling, identification, design, configuration, and appearance of Wheel of Fortune-themed electronic gaming devices as containing Bonus Wheel Features which operate in a manner consistent with a traditional mechanical wheel that operates naturally pursuant to the laws of physics.

101.    The misconduct and fraud committed by Defendants has occurred in the Casino Defendants' properties on each day in which the Wheel of Fortune-themed gaming devices were operated in their gaming establishments.  Those machines continue to operate as of the day of the filing of this Complaint.

102.    The predicate acts of mail and/or wire fraud which establish the pattern of racketeering activity under 18 U.S.C. § 1961(5) all pertain to and further the fraudulent scheme described above.

103.    Each of the Defendants participated in this fraudulent scheme intentionally and for the purpose of maximizing revenue generated by Wheel of Fortune-themed electronic gaming devices.

104.    Defendants devised the scheme alleged herein to defraud or to obtain money from Plaintiffs and the Class by means of false or fraudulent pretenses or representations.   In furtherance of and for the purpose of executing such scheme or artifice or attempting to do so, Defendants knowingly placed or caused to be placed in the United States mails materials to be

delivered by the Postal Service, as described herein and otherwise, constituting multiple acts of mail fraud under 18 U.S.C. § 1341.

105.    Defendants devised the scheme alleged herein to defraud or to obtain money from Plaintiffs and the Class by means of false or fraudulent pretenses or representations.   In furtherance of and for the purpose of executing such scheme or artifice or attempting to do so, Defendants knowingly placed or caused to be placed transmissions over interstate wires, as described herein and otherwise, constituting multiple acts of mail fraud under 18 U.S.C. § 1341.

106.    The specific mail and wire communications which are part of the predicate acts of mail and wire fraud advanced defendant's fraudulent scheme.  Plaintiffs need not and does allege that each such mail or wire communication was, itself, fraudulent.

107.    Each of the Defendants has engaged in mail and wire communications in furtherance of the fraudulent scheme described herein.  Such instances of mail and wire fraud are related and continuous.  They therefore comprise a pattern of racketeering activity under 18 U.S.C. § 1961(5).

108.    Defendants received significant income derived from their fraudulent scheme to mislead the gaming public regarding the Wheel of Fortune-themed electronic gaming devices. Such racketeering income included substantial revenues from the play of Wheel of Fortune-themed gaming devices.  Much of such revenue was then used to operate and expand the forgoing enterprises through research, design, development, and deployment of new machines, and the acquisition of more machines and increasing the number and size of gaming establishments with such machines.

109.    Plaintiffs and each member of the Class played a Wheel of Fortune-themed gaming device featuring a Bonus Wheel Feature at one of the Casino Defendants' casinos where such machines were displayed and available for play.  Plaintiffs and the Class members were injured in their property through the expenditure and loss of their money to play such devices.  This was made possible by the continued operation and expansion of the enterprises through reinvestment of racketeering proceeds in research, design, and development of new gaming devices, and increasing the number and size of casinos at which such devices were displayed and available for

play.  Plaintiffs' and the Class's injuries thus resulted from Defendants' use and investment of

the proceeds of their racketeering activity in violation of 18 U.S.C. § 1962(a) in that Plaintiffs

played and lost property (e.g., money) on gaming devices and at establishments developed and/or

expanded through the use of racketeering proceeds.

110.    Under 18 U.S.C. § 1964(c) Plaintiffs and the Class are entitled to treble their general

and special compensatory damages, plus interest, costs, and attorneys' fees.

**SECOND CLAIM FOR RELIEF**
**RICO, 18 U.S.C. § 1962(c)**
**By Plaintiffs, Individually and On Behalf of Members of the Class**

111.    Plaintiffs reallege the foregoing paragraphs as though fully set forth herein.

112.    Defendants are associated with the enterprises alleged above.  In violation of 18

U.S.C. § 1962(c), Defendants have conducted and/or participated in the conduct of the affairs of

such enterprises, including but not limited to, participating in activities in furtherance of the

Defendants' fraudulent scheme, through the pattern of racketeering activity alleged above.

113.    Defendants conducted and/or participated in the affairs of the enterprises alleged

above through the use of interstate wires and the mail, including but not limited to Defendants'

promotion of the false and misleading design of the Wheel of Fortune-themed electronic gaming

devices, the promotion of the false and misleading branding and labelling of the Wheel of Fortune-

themed electronic gaming devices, the payment of consideration in exchange for the delivery of

the Wheel of Fortune-themed electronic gaming devices, the coordination of the shipment of such

Wheel of Fortune-themed electronic gaming devices, and communications regarding the

configuration, maintenance, and repair of the Wheel of Fortune-themed electronic gaming devices.

114.    As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(c),

Plaintiffs and the Class were induced to, and did, expend money playing the Wheel of Fortune-

themed electronic gaming devices, manufactured and promoted by Defendant IGT, at the Casino

Defendants' gaming establishments.  Plaintiffs and the Class were injured by Defendants' unlawful

conduct in that, had they known the truth about the way in which the Wheel of Fortune-themed

gaming devices operate, they would not have risked money playing the devices.  Plaintiffs and

members of the Class were further injured by the loss of all or part of the money they spent playing

1  the Wheel of Fortune-themed electronic gaming devices.  Such money spent and / or lost

2  constitutes property of Plaintiffs and the Class under 18 U.S.C. § 1964(c).

3      115.  Under 18 U.S.C. § 1964(c), Plaintiffs and the Class are entitled to treble their

4  general and special compensatory damages, plus interest, costs, and attorneys' fees.

5  **THIRD CLAIM FOR RELIEF**<br>**RICO, 18 U.S.C. § 1962(d)**

6  **By Plaintiffs, Individually and On Behalf of Members of the Class**

7      116.  Plaintiffs reallege the foregoing paragraphs as though fully set forth herein.

8      117.  Defendants conspired to violate 18 U.S.C. § 1962(a) and 18 U.S.C. § 1962(c) as

9  alleged above an as presented in summary form below.

10      118.  Defendant IGT conspired with the Casino Defendants to distribute and promote the

11  Wheel of Fortune-themed electronic gaming devices.  Defendant IGT disclosed the true nature of

12  the Bonus Wheel Feature of the Wheel of Fortune-themed electronic gaming devices to the Casino

13  Defendants and then enlisted their assistance in a conspiratorial course of conduct designed to

14  defraud the gaming public.  Defendants conspired to promote the misleading and fraudulent

15  design, labeling, and branding of the Wheel of Fortune-themed electronic gaming devices to the

16  public through the use of the mail and interstate wires.  Defendants engaged in this conspiratorial

17  scheme with the common objective of inducing casino patrons to both play the Wheel of Fortune-

18  themed electronic gaming devices even though they would not have played such devices had the

19  true nature of these games been known, and to spend more money playing the Wheel of Fortune-

20  themed electronic gaming devices than they would have had the true nature of these games been

21  known.  Defendants then reinvested the money made from the scheme in promoting and expanding

22  the availability of the Wheel of Fortune-themed electronic gaming devices to further enlarge the

23  conspiracy.

24      119.  As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(d),

25  Plaintiffs and the Class were induced to, and did, play and expend money playing Defendants'

26  Wheel of Fortune-themed electronic gaming devices.  Plaintiffs and the Class were injured by

27  Defendants' unlawful conduct in that, had they known the truth about the way in which the Wheel

28  of Fortune-themed gaming devices operate, they would not have risked money playing the devices.

1    Plaintiffs and members of the Class were further injured by the loss of all or part of the money

2    they spent playing the Wheel of Fortune-themed electronic gaming devices.  Such money spent

3    and/or lost constitutes property of Plaintiff and the members of the Class under 18 U.S.C. §

4    1964(c).

5        120.    Under 18 U.S.C. § 1964(c), Plaintiffs and the class are entitled to treble their

6    general and special compensatory damages, plus interest, costs, and attorneys' fees.

7                            **FOURTH CLAIM FOR RELIEF**
                                **Common Law Fraud**
8            **By Plaintiffs, Individually and On Behalf of Members of the Class**

9        121.    Plaintiffs reallege the foregoing paragraphs as though fully set forth herein.

10       122.    Defendants induced Plaintiff and the Class to spend money playing the Wheel of

11   Fortune-themed electronic gaming devices by knowingly making false and misleading

12   representations, and concealing the true facts, concerning the operation of such devices.

13   Defendants' manipulative and deceptive conduct has consisted of the deliberate design,

14   appearance, labelling, branding, promotion, distribution, configuration, and maintenance of the

15   Wheel of Fortune-themed electronic gaming devices.  Such deception was intended to suggest that

16   the Wheel of Fortune-themed electronic gaming devices are games of chance comparable to games

17   featuring a naturally spinning wheel subject to the laws of physics.  Defendants knew that such

18   representations were false and that the public image and understanding of their machines was false

19   and misleading.  Defendants also know that the Plaintiffs and the Class did not know the true facts

20   about the Wheel of Fortune-themed electronic gaming devices and intended that the Plaintiffs

21   would rely upon their false and misleading representations and concealment of the true nature of

22   the machines.

23       123.    Plaintiffs and the Class relied upon Defendants' false and misleading

24   representations, omissions, concealment, and deceptive conduct, and consequently suffered injury

25   by spending and losing money to play the Wheel of Fortune-themed electronic gaming devices at

26   the Casino Defendants' gaming establishments, in an amount to be determined at trial.

27

28

### FIFTH CLAIM FOR RELIEF
**Unjust Enrichment**
**By Plaintiffs, Individually and On Behalf of Members of the Class**

124.    Plaintiffs reallege the foregoing paragraphs as though fully set forth herein.

125.    As a result of Defendants' wrongful conduct described herein, Defendants received income to which they had no legal right, and were thereby unjustly enriched at Plaintiffs' and the Class's expense and to their detriment, in an amount to be determined at trial.

### SIXTH CLAIM FOR RELIEF
**Negligent Misrepresentation**
**By Plaintiffs, Individually and On Behalf of Members of the Class**

126.    Plaintiffs reallege the foregoing paragraphs as though fully set forth herein.

127.    Defendants owe a duty to the public to act with reasonable care in providing information concerning the nature and operation of electronic gaming devices which they operate or manufacture.

128.    Defendants breached their duty to Plaintiffs and the Class by negligently misrepresenting and failing to disclose to Plaintiffs and the Class the true nature and operation of the Wheel of Fortune-themed electronic gaming devices.

129.    Plaintiffs and the Class relied upon Defendants' negligent misrepresentations and omissions, and consequently suffered injury by spending money to play the Wheel of Fortune-themed electronic gaming devices at the Casino Defendants' gaming establishments, in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek a judgment against Defendants, individually and on behalf of the members of the Class, as follows:

A.    For an order certifying the Classes pursuant to Federal Rule of Civil Procedure 23 and naming Plaintiffs as representatives of the Classes and Plaintiffs' undersigned attorneys as counsel to represent the Class;

B.    For an order entering judgment in favor of the Plaintiffs and the members of the Class on all claims for relief stated herein;

C.      For an order awarding compensatory and punitive damages with respect to the First, Second, and Third Claims for Relief in an amount to be determined at trial, together with interest thereon, plus special, consequential and incidental damages (with the general and special compensatory damages trebled pursuant to 18 U.S.C. § 1964(c)), costs of suit and reasonable attorneys' fees;

D.      For an order awarding Plaintiffs and the members of the Class compensatory and punitive damages with respect to the Fourth, Fifth, and Sixth Claims for Relief in an amount to be determined at trial, together with interest thereon, plus special, consequential and incidental damages, costs of suit, and reasonable attorneys' fees; and

E.      For an order for appropriate injunctive relief.

### DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and members of the Classes, hereby demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all claims and issues so triable.

Dated: November 21, 2024      THE O'MARA LAW FIRM, P.C.

/s/ David C. O'Mara, Esq.
DAVID C. O'MARA, ESQ.
311 E. Liberty St
Reno, NV 89501
775.323.1321
david@omaralaw.net

**THE MILLER LAW FIRM**
E. POWELL MILLER*
950 W. University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
E-Mail: epm@millerlawpc.com

**HEDIN LLP**
FRANK S. HEDIN*
1395 Brickell Ave, Suite 610
Miami, Florida 33131
Telephone: (305) 357-2107
E-Mail: fhedin@hedinllp.com

**HEDIN LLP**
TYLER K. SOMES*
1100 15th Street NW, Ste 04-108
Washington, D.C. 20005
Telephone: (202) 900-3331
E-Mail: tsomes@hedinllp.com

*Pro Hac Vice Pending*